**SO ORDERED: March 20, 2018.**



_____
James M. Carr
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JERMALE ALLEN OWENS and | ) | Case No. 16-07620-JMC-7A |
| DIONNE DENISE OWENS, | ) | |
| | ) | |
| Debtors. | ) | |
| ─────────────────────────── | ) | |
| | ) | |
| STATE OF INDIANA on the relation of the | ) | |
| INDIANA DEPARTMENT OF | ) | |
| WORKFORCE DEVELOPMENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 17-50002 |
| | ) | |
| JERMALE ALLEN OWENS, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on May 30, 2017. Plaintiff State of Indiana on the relation of the Indiana Department of Workforce Development ("DWD") appeared by counsel Heather Crockett and Megan E. Binder. Defendant Jermale Allen Owens

("Owens") appeared by counsel Thomas H. Rothe. At the conclusion of the trial, the Court took the matter under advisement.

The Court, having reviewed the evidence presented at the trial, the *Trial Brief* filed by Debtor on May 25, 2017 (Docket No. 14), the *Brief in Support of Position* filed by DWD on May 25, 2017 (Docket No. 15) ("DWD's Brief"), and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## **Findings of Fact**

The Court makes the following findings of fact:

1. On September 30, 2016, Owens and Dionne Denise Owens filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[1] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

2. On January 4, 2017, Owens received his general discharge.

3. On January 3, 2017, DWD timely filed the *Complaint to Determine Dischargeability of Debt* (Docket No. 1) (the "Complaint"), wherein DWD alleges that Owens owes a debt to DWD that is nondischargeable under §§ 523(a)(2)(A) and/or (a)(7).

4. After he lost his job because his employer, Accurate Outsourcing, ceased operations in or about November 2008, Owens applied for unemployment benefits at the Work One office on Indianapolis' east side (the "Office"). During that period of time (sometimes

---

[1] All statutory references herein are to the Bankruptcy Code unless otherwise noted.

called the "Great Recession"), many people were applying for unemployment benefits. Owens testified that the Office was crowded and busy; the lines of applicants at the Office, often stretching out the door, yielded a wait time of 30 minutes to 3 hours each time Owens went to the Office; and Owens could not reach anyone at DWD by phone.

5. Owens applied for unemployment insurance benefits by submitting a weekly voucher (the "Voucher(s)") to DWD via an online process using the computers available at the Office. Though he began applying in November 2008, only the Vouchers Owens submitted for the period January 18, 2009 through May 29, 2010 (the "Relevant Period") are at issue in this adversary proceeding.

6. As part of the online process to submit his Vouchers, Owens was asked "Did you work?" Owens answered "no" to that question when submitting each of the 48 Vouchers to DWD.

7. In the Spring of 2010, DWD initiated an investigation into Owens' claims after the Metropolitan School District of Lawrence Township ("MSDLT") contacted DWD and reported that Owens was working for MSDLT at the same time MSDLT was being charged for Owens' unemployment benefits.

8. DWD's investigation revealed that during the Relevant Period, notwithstanding his representations that he had not worked, Owens was employed:

    a. as a coach during certain sports seasons for MSDLT. *See* Ex. 8.[2]

    b. as an OPS driver for Medline Industries Inc. ("Medline") beginning on December 11, 2009.

---

[2] Of the six contracts submitted as part of Exhibit 8, the first two cover time periods preceding the Relevant Period. The Court does not consider those two contracts relevant to the disposition of this adversary proceeding.

9. The DWD investigator, Erin Certolic, issued her "Investigator Report" dated February 16, 2012, which concluded that Owens "knowingly failed to disclose employment and earnings or other material facts" that resulted in the overpayment of benefits that total, along with applicable penalties, $29,343. *See* Ex. 20. On February 24, 2012, DWD mailed three "Determination of Eligibility" letters, along with the corresponding "Notice of Potential Overpayment," to Owens, notifying Owens that DWD had determined that Owens had "received benefits to which [he was] not entitled and which [he is] now liable to repay" to DWD along with penalties and interest.[3] *See* Exs. 21-26. Owens did not appeal DWD's determination by the March 5, 2012 deadline.

10. Owens testified that:

a. Owens was not diligent about reading each question asked in the online process of submitting his weekly Vouchers; rather, he just "scrolled through" them. The Office was crowded, the lines were long and people were standing in line behind him at the computers, leading Owens to be concerned that confidential information, e.g., his social security number, was exposed to those waiting in line behind him. There were so many people in the Office that Owens both rushed himself and viewed the Office staff as trying to "rush us out."

b. Around Christmas 2008, Owens explained to a "case worker" at the Office that he was coaching for MSDLT – work that was not considered a full-time or part-time job, but that was performed during certain seasons. Owens asked the case worker whether he could still apply for benefits. The case worker told Owens that he could still

---

[3] Although 48 weekly Vouchers were submitted as part of Exhibit 4, the notices of potential overpayment in Exhibits 22, 24 and 26 only reference 46 benefit weeks. The weeks ended May 29, 2010 and November 21, 2009 do not appear to have been included in the calculations sets forth in the notices of potential overpayment.

apply/file for benefits even if he was working seasonally. Owens acknowledges that the case worker did not tell him how to answer each question in the Voucher-submission process.

    c.    Owens was confused. In his mind, Owens linked "work" with "finances." When he was employed full-time and earning regular paychecks, he knew he was employed. He did not view himself as being employed when he was coaching for MSDLT 1½ - 2 hours per day, Monday through Thursday, during a particular sports season and only being paid two stipends during the term of the coaching contract. On cross examination, Owens testified that he did not understand the question 'Did you work?" to mean *did you have a job?*, rather than *are you being paid this week?* Owens understood that he was "unemployed" when he had no full-time job and was not coaching. He believed that he was "unemployed" when he was only coaching.

    11.    All testimony regarding the conversations between Owens and the case worker(s) at the Office and Owens' state of mind is credible and unrebutted. Based on all of Owens' testimony, it can be reasonably inferred that Owens thought he was unemployed and understood his conversation with the case worker at the Office to confirm that his seasonal coaching did not count as employment. Therefore, he believed he was accurately answering the question "Did you work?" when he responded "no."[4]

    12.    Marsha White, DWD's fraud investigations manager, testified that DWD has to rely on the answers given by claimants in the weekly vouchers in determining eligibility – answers that are supposed to be accurate, true and honest – because it would be a "task impossible" for DWD to manage every single claimant and discover what each claimant could or

---

[4]    Owens testified that he thought he answered "yes" to this question when he was employed by Medline. If he answered no, he was mistaken. *See infra* Finding of Fact ¶ 16.

could not have been doing during the week. Betty Titus, DWD's division chief of benefit payment control, echoed Ms. White's testimony that it would be impossible and impracticable for DWD to call employers to make sure representations of claimants are correct. For example, if a claimant was working but did not report that work, then DWD would not know what employer to call. Until contradictory information is available,[5] DWD believes what claimants say. Here, DWD relied on Owens' representations and paid unemployment insurance benefits, both regular and extended, to Owens during the Relevant Period.

13. Ms. Titus testified regarding the distinction between applying for benefits, which anyone can do, and being eligible to receive benefits, which not every applicant is. She believes that DWD employees would not tell claimants not to file a claim, nor would employees tell claimants not to report earnings. Based on Owens' testimony, it does not appear to the Court that Owens understood the distinction between applying for benefits and being eligible for benefits, in connection with his conversation with the DWD case worker. When Owens asked the case worker whether Owens could still apply for benefits even though he was coaching, the Court believes Owens meant to ask whether he was eligible for benefits.

14. Ms. Titus further testified regarding the usefulness of the handbook[6] in answering claimants' questions. The Court reviewed the Handbook on three key points and finds that it would not have been helpful to Owens if he had reviewed it.

---

[5] To identify fraud, DWD performs "cross-matches" including a new hire cross-match which happens immediately and tax and inter-state cross-matches which happen quarterly. DWD also receives information from other sources, such as employer protests, that indicates possible fraud.

[6] The *Unemployment Insurance Claimant Handbook* (the "Handbook") admitted into evidence at the Trial has a revision date of December 21, 2015, and thus does not appear to have been the version in effect during the Relevant Period. *See* Ex. 3.

      a.      The Court found no reference in the Handbook to explain or give illustrative examples of how to answer the question "Did you work?" The information in the Handbook under the heading "**The following individuals are not considered unemployed and are not eligible for unemployment insurance benefits**" does not address Owens' situation. *See* Handbook, p. 9.

      b.      The Court found only one reference in the Handbook to "seasonal" employment – in the Frequently Asked Questions section.

> **Can I get benefits if I am a seasonal worker?** If your employer has been granted seasonal status (the business operates less than 26 weeks a year) and has requested the designation of seasonal employer, you will not be eligible for benefits during the off season. You will be notified if your employer has been granted seasonal status on your *Wage and Benefit Computation*.

*See* Handbook, p. 24. The description provides information regarding benefits during the "off season" but provides no guidance for how Owens should account for such employment during the season.

      c.      The Court found no references in the Handbook to explain how to calculate or report contractual earnings such as those Owens received from MSDLT in two stipends over the term of the applicable coaching contract. Ms. White testified as to the methodology used by DWD in its investigation to allocate Owens' compensation among the weeks covered by the contracts. It is unclear, though, how Owens would have had access to such information to report those earnings accurately (had he considered coaching to be employment) or to understand that he may have been eligible to receive at least partial benefits during the contract term. *See* Handbook, p. 15.

15.      It seems to the Court that DWD suggested that the Handbook is the main reference point for claimants such as Owens, as well as case workers, to answer questions

regarding unemployment claims, but the Handbook does not answer the questions relevant to Owens' claims.  Therefore, even if he had reviewed the Handbook, Owens would not have had the direction he needed with respect to whether his coaching constituted employment that would disqualify him for benefits.  It was reasonable for Owens to rely on information given to him by the Office staff, as he understood it.  Owens was further justified in relying on such information because the "WARNING" available to Owens online during the Voucher-submission process (*see* Ex. 1, page 2) does not specifically address "seasonal" or contract work or how to report stipends received during a contract period.

16.    As of the trial, DWD calculates the total overpayment including interest and penalties due and owing from Owens to DWD to be $34,158.21.  Owens conceded at trial that, of the 48 weekly claims submitted, the benefits paid by DWD and the penalties thereon totaling $17,560 – based upon the last 14 vouchers included in Exhibit 4 (starting with the week ending 12/12/2009 and going through the week ending 03/13/2010)[7] – should be determined non-dischargeable because Owens was working full-time at Medline during that period and he candidly admitted filing those claims mistakenly.  After subtracting the $17,560, the amount of the debt at issue in this adversary proceeding is $16,598.21 (the "Debt"), which consists of $8,639 in overpayments, $5,089.21 in interest on the overpayments, and $2,870 in penalties.

---

[7]    As Ms. White testified, the Vouchers included in Exhibit 4 are not in chronological order.  The last Voucher in Exhibit 4 is for the week ended March 13, 2010, but there are Vouchers for 11 additional calendar weeks (through the week ended May 29, 2010) that are out of chronological order.  It is unclear whether Owens intended to concede to the nondischargeability of the last 14 Vouchers as they appear in Exhibit 4 or the last 14 Vouchers chronologically.  This distinction is material because certain of those weeks incurred a 50% penalty and others incurred a 100% penalty.  The overpayment calculation with penalties for the last 14 Vouchers in Exhibit 4 is $10,928.  The overpayment calculation with penalties for the last 14 Vouchers chronologically is $8,715.  Neither of these numbers is close to the $17,560 figure presented at trial by DWD and accepted by Owens.  However, if the Court were to include all 24 Vouchers that are dated after December 11, 2009, the date Owens started working at Medline, the sum of overpayments plus penalties (but without interest) is $17,153.  To give full weight to Owens' concession that the unemployment benefits paid to him while he was working for Medline were mistakenly applied for and wrongfully received, the Court deems the concession to cover all Vouchers dated after December 11, 2009.

## Conclusions of Law

1.  Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2.  This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

3.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.  Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

5.  Exceptions to discharge under § 523 "are to be [construed] strictly against a creditor and liberally in favor of the debtor." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)). "The burden is on the objecting creditor to prove exceptions to discharge." *Id.* (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

*§ 523(a)(2)(A)*

6.  Section 523(a) provides, in relevant part:

    A discharge under section 727 … of this title does not discharge an individual debtor from any debt –

    (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

        (A)  false pretenses, a false representation, or actual fraud … .

7.  The Seventh Circuit has noted material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." *See Rae v.*

*Scarpello (In re Scarpello)*, 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)).

8. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" theories, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

9. "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.'" *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (quoting *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 959 (Bankr. N.D. Ill. 1995) (internal quotations omitted)). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928 (citation omitted).

10. A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.* (citing *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). "An intentional falsehood relied on

under § 523(a)(2)(A) must concern a material fact." *Scarpello*, 272 B.R. at 700 (citing *Jairath*, 259 B.R. at 314).

11. Justifiable reliance is an intermediate level of reliance which is less stringent than "reasonable reliance" but more stringent than "reliance in fact." *See Field v. Mans*, 516 U.S. 59, 72-73, 116 S.Ct. 437, 445, 133 L.Ed.2d 351 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id.* at 71 (quotations omitted). Justifiable reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id.* (quotation omitted).

12. "Scienter, or intent to deceive, is … a required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud." *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016) (citations omitted).

13. A debtor's intent to deceive for purposes of the false pretenses and false representation prongs on § 523(a)(2)(A) "is measured by a debtor's subjective intention at the time the representation was made." *Scarpello*, 272 B.R. at 700 (citing *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)). "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." *Hanson*, 432 B.R. at 773 (internal citations omitted).

14. "[A]ctual fraud is broader than misrepresentation," *McClellan*, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability for "actual fraud." *Scarpello*, 272 B.R. at 700 (citing *McClellan*, 217 F.3d at

894).  "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal citations omitted).  *See also Husky Int'l Elec., Inc. v. Ritz*, -- U.S. --, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud:  It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.' ") (quotation omitted).  In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute." *Hanson*, 432 B.R. at 772 (citing *McClellan*, 217 F.3d at 894).

15. "[T]he focus of an 'actual fraud' claim is on the defendant's state of mind at the time of his purportedly fraudulent conduct." *Merritt v. Wiszniewski (In re Wiszniewski)*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. 2010) (citation omitted).

16. Owens was working during certain sports seasons for MSDLT while he was collecting unemployment benefits.  DWD reasonably relied on Owens' representations on the Vouchers that he was not working when awarding Owens unemployment benefits.  Therefore, the only question, under any of the three prongs of § 523(a)(2)(A), is whether Owens intended to deceive DWD.

17. In DWD's Brief, DWD suggests that the question "Did you work?" is "simple" and that the "repeated and on-going nature" of Owens' "no" answers permit the inference of an intent to deceive.  DWD's Brief, p. 8.  To Owens, the question was not so simple.  Here, Owens was rushing and/or was rushed by DWD staff to complete the online Voucher-submission process.  Owens was confused, so much so that he attempted to get clarification regarding his

MSDLT coaching contract from staff at the Office. Based on his understanding of the conversation, he thought his coaching did not count as "work." (Had Owens asked a more precise question of the case worker – "am I considered to be working when I coach school athletic teams and get paid by stipend two times during the sports season?" – Owens might have understood his situation far differently.)

18. The Court must determine Owens' state of mind during the Relevant Period (the time of the purportedly fraudulent conduct as per *Wiszniewski*, 2010 WL 3488960 at *5). It is clear to the Court that when Owens submitted the Vouchers, he was confused about whether his coaching was "work." Confusion is not the equivalent of fraud. The Court's review of the surrounding circumstances to see if fraudulent intent can be inferred (*Hanson*, 432 B.R. at 773) does not support an inference of fraudulent intent. There are two "surrounding circumstances" that give the Court pause, but neither of them is sufficient for the Court to conclude that Owens had fraudulent intent:

    a. Because Owens linked "work" with "finances," why did he not report that he worked during those two weeks out of a contract term when he received a stipend payment? The Court believes this is because, relying on information provided by the Office staff, Owens did not consider coaching to be work that needed to be reported in the first place.

    b. Because Owens knew he was working when he was employed full-time and earned regular paychecks, why did Owens continue to go to the Office to apply for unemployment benefits after he started full-time employment with Medline on December 11, 2009? Owens' employment status and state of mind after December 11, 2009 are materially different than before such date because the coaching contract is no

longer relevant, so the Court concludes that this "surrounding circumstance" does not change the Court's determination regarding whether Owens intended to deceive DWD by answering "no" to the question "Did you work?" in the online Voucher-submission process prior to December 11, 2009.

19. The Court concludes that Owens was not acting with fraudulent intent. The reasons Owens offered were plausible and coherent as to what his thinking was at that time. The Court concludes that, in this instance, Owens did not intend to deceive DWD by not recognizing the MSDLT coaching contracts as "work."

20. DWD has failed to meet its burden to prove that the Debt should be excepted from discharge pursuant to § 523(a)(2)(A). Therefore, the Court concludes that the non-penalty portion of the Debt is not excepted from discharge pursuant to § 523(a)(2)(A).

### *§ 523(a)(7)*

21. A debt is not dischargeable pursuant to § 523(a)(7) "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss… ."

22. There was no dispute or argument at trial regarding DWD's claim that the penalties it imposed against Owens pursuant to Ind. Code § 22-4-13-1.1(b) are excepted from discharge pursuant to § 523(a)(7).

23. The Court notes that there is no intent element in determining whether a penalty is excepted from discharge pursuant to § 523(a)(7). Therefore, the fact that the Debt contains penalties payable to and for the benefit of DWD, a governmental unit, which are not compensation for actual pecuniary loss is sufficient to satisfy § 523(a)(7).

24. Therefore, the Court concludes that the penalty portion of the Debt is excepted

from discharge pursuant to § 523(a)(7).

## **Conclusion**

Based on the foregoing, the Court hereby concludes that:

A.  Pursuant to Owens' concession, $17,560 is excepted from discharge pursuant to §§ 523(a)(2)(A) and/or (a)(7).

B.  The non-penalty portion of the Debt ($13,728.21) is not excepted from discharge pursuant to § 523(a)(2)(A).

C.  The penalty portion of the Debt ($2,870) is excepted from discharge pursuant to § 523(a)(7).

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #